# EXHIBIT A

| | |
|---|---|
| **From:** | law nikagholston.com |
| **To:** | Maya Anderson; Joan Andrews |
| **Cc:** | Sarah Vaughn; Katie Cox |
| **Subject:** | Re: DP-2425-04B: Final Decision |
| **Date:** | Tuesday, March 25, 2025 10:53:36 AM |
| **Attachments:** | Findings of Fact and Final Order .pdf |

Dear Counsels:

Please take notice that there was an error on page 25; the language should read "create a skill acquisition program individualized for P.H. with pertinent goals matched to **Utah** Standards."; see Corrected Order attached.

I apologize for any confusion or inconvenience.

Thank you,

NG

---

**From:** Maya Anderson <mvanderson@disabilitylawcenter.org>
**Sent:** Monday, March 24, 2025 9:01 PM
**To:** law nikagholston.com <law@nikagholston.com>; Joan Andrews <jandrews@fabianvancott.com>
**Cc:** Sarah Vaughn <svaughn@fabianvancott.com>; Katie Cox <kcox@disabilitylawcenter.org>
**Subject:** Re: DP-2425-04B: Final Decision

Madam Hearing Officer Gholston,

I can confirm that Petitioner's counsel have received the decision. Thank you very much for all of your work in this case.

Best,
Maya A.

--
**Maya Anderson**
*Staff Attorney*

Phone: (801) 363-1347 ext. 3217
Fax: (801) 363-1437
mvanderson@disabilitylawcenter.org

CONFIDENTIALITY NOTICE**:** This email transmission, and any documents, files or previous email messages attached to it may contain confidential information that is legally privileged.  If you are not the intended recipient or the person responsible for delivering it to the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of any of the information contained in or attached to this transmission is strictly prohibited. If you have received this transmission in error, please immediately notify us by telephone at (800) 662-9080 and destroy the original transmission and its attachments without reading them. Thank you.

**From:** "law nikagholston.com" <law@nikagholston.com>
**Date:** Monday, March 24, 2025 at 7:27 PM

**To:** Maya Anderson <mvanderson@disabilitylawcenter.org>, Joan Andrews
<jandrews@fabianvancott.com>
**Cc:** Sarah Vaughn <svaughn@fabianvancott.com>, Katie Cox <kcox@disabilitylawcenter.org>
**Subject:** DP-2425-04B: Final Decision

Dear Counsels:

Please confirm your receipt of the Final Decision for DP-2425-04B, P.H. v. Jordan School
District.

Thank you,

**Nika Gholston, Esq.**
Nika Gholston Law, L.L.C.

**Physical Address**
8428 Crossland Loop
Montgomery, AL 36117
Telephone: (334) 676-3903
Email: *law@nikagholston.com*
Website: *www.nikagholston.com*

**Mailing Address**
P.O. Box 231101
Montgomery, AL 36123

*Follow us on Facebook!*
*Facebook*

The information contained in this e-mail message is legally privileged and is intended only for the privileged, personal and confidential use of the designated recipient(s) named in the address box. Do NOT forward this message to any third party. If the reader of this message is not the intended recipient or agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error, and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this message in error, please notify **Nika Gholston Law, L.L.C.** immediately by telephone; delete this message from all your files, and return any printouts you may have made to us by regular mail.

IRS Circular 230 Disclosure – To ensure compliance with requirements imposed by the IRS, we inform you that any U.S. federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction, or matter addressed herein.

Neither **Nika Gholston Law, L.L.C.**, its agents, employees, assigns or Nika Gholston provide tax advice. Nothing herein should be construed as tax advice. Recipient(s) is/are advised to seek tax advice from a properly qualified tax professional. If for any reason, you believe you have received tax advice from Nika Gholston Law, L.L.C. its agents, employees, assigns or Nika Gholston, you are mistaken and are instructed to ignore and to not follow any information you believe to be tax advice. Neither Nika Gholston Law, L.L.C. its agents, employees, assigns or Nika Gholston is a tax attorney and is/are not qualified in any way to give tax advice. You are again instructed to seek tax advice from a properly qualified tax professional.

CAUTION: This email originated from outside the Fabian VanCott organization. Do not click on links or open attachments unless you recognize the sender and know the content is safe.

IN THE ADMINISTRATIVE LAW COURT OF THE
UTAH DEPARTMENT OF EDUCATION
SPECIAL EDUCATION SERVICES DIVISION
DUE PROCESS HEARING

| | | |
|---|---|---|
| In the Matter of: | ) | **DECISION AND ORDER** |
| | ) | |
| **P.H.,** a minor, by and through a parent, | ) | |
| Alisha Hadden | ) | **Case Number: DP-2425-04B** |
| | ) | |
| *Petitioner*, | ) | |
| | ) | **Hearing Officer: Nika Gholston** |
| v. | ) | |
| | ) | |
| **Jordan School District**, | ) | |
| | ) | |
| *Respondent*. | | |

## FINDINGS OF FACT AND FINAL ORDER

### <u>Jurisdiction</u>:

This proceeding was invoked in accordance with the Individuals with Disabilities Education Act ("IDEA"), as amended in 2004, codified at 20 U.S.C. §§1400, et seq.; Educ. Law § 4404[1]; 34 CFR 300.151-300.152, 300.506, 300.511; Utah State Bd. of Educ., Special Educ. Rules IV.M. (2)-(3)(a)-(e), (2016).

### <u>Procedural History</u>:

Petitioner is the parent of P.H. ("Student") who is currently classified by the Jordan School District (JSD) as a student with an educational disability of Autism. On September 24, 2024, Petitioner filed a Due Process Complaint against JSD alleging a denial of FAPE, specifically the Parent alleges that JSD predetermined P.H.'s educational placement and IEP through a district-level LRE process. The Parent further alleges that she was denied an opportunity to meaningfully participate in the IEP process because decisions were made by the district prior to IEP team meeting.

A remote due process hearing convened on February 3-5, 2025. The Parent was represented by Maya Anderson and Katie Cox, Attorneys for The Disability Law Center. JSD was represented by Joan Andrews and Sarah Vaughn, Attorneys at Fabian Vancott.

### Issues Presented:

1. Did JSD deny Student a free and appropriate public education ("FAPE") by failing to offer a continuum of alternative placement, instead limiting the services and placements Student received on the basis of resource availability?

2. Did JSD deny Student FAPE by determining Student's placement and services through a District-level LRE Committee?

3. Did JSD deny Student FAPE by failing to ensure that Student's parents were afforded the opportunity to meaningfully participate in IEP meetings?

4. Did JSD deny Student FAPE by failing to develop and implement an IEP that was reasonably calculated to allow Student to make progress in light of Student's unique needs?

### Burden of Proof:

On November 14, 2005, the United States Supreme Court issued a decision in <u>Schaffer v. Weast</u>, the majority held that, "The burden of proof in an administrative hearing challenging an IEP is properly placed upon the party seeking relief." <u>Schaffer v. Weast</u>, 546 U.S. 49, 129 S. Ct. 528 (2005). Here, the burden of proof is placed on the Petitioner.

### Exhibits Admitted into Evidence

There were numerous exhibits submitted by the parties and accepted into evidence by the undersigned. These exhibits have been examined by the undersigned subsequent to the Due Process Hearing in light of the testimony presented at said hearing. The undersigned placed no weight on the fact that any particular matter was offered by any party since the purpose was to get

all of the appropriate documents produced for consideration by the undersigned so long as they were not prejudicial to any other party participating in the Due Process Hearing based upon objection. The documents were examined and the weight given to each was based upon the contents of the document which was submitted and not on which party introduced said document. The undersigned has examined the exhibits based upon the substantive nature contained therein for the purpose of making a decision in this matter.

### **Petitioner's Witnesses**

1. Angela Johnston, UT -Licensed Teacher
2. Alisha Hadden, Parent

### **Respondent's Witnesses**

1. Carollee Tautkus, Special Education Teacher Specialist
2. Cassidy Wood, Teacher
3. Kathleen Garibaldi, School Psychologist
4. Ben Washburn, Behavior Specialist
5. Victoria Gustafon, Teacher Specialist
6. Brian King, Assistant Special Education Director
7. Kim Lloyd, Special Education Director

### **Joint Statement of Undisputed Facts and Material Admissions**

1. For the entirety of the 2022-2023 school year, Student attended kindergarten in a special class placement located at Golden Fields Elementary School ("Golden Fields").

2. For the 2022-23 school year, Student's initial operative IEP was dated May 27, 2022. *See* Respondent's Exhibit 9.

3. For the 2022-23 school year, Student's initial operative Behavior Intervention Plan ("BIP") was dated December 15, 2022. *See* Joint Exhibit 2.

4. During the spring of 2023, a psychoeducational assessment and evaluation was performed. *See* Joint Exhibit 6.

5. During the 2022-23 school year, IEP meetings were held April 12, 2023, May 22, 2023, and May 26, 2023.

6. A new IEP was developed and signed by the parties dated May 26, 2023. *See* Joint Exhibit 16.

7. At the beginning of 2023-2024 school year, Student initially continued to attend 1st grade in a special class placement at Golden Fields.

8. IEP meetings were held on September 25, 2023, and October 10, 2023.

9. On or around November 1, 2023, Student began attending 1st grade in a special class at Herriman Elementary School.

10. Additional IEP meetings were held January 3, 2024, and January 31, 2024.

11. An IEP annual review team meeting was held on February 7, 2024. *See* Joint Exhibit 72.

12. On or about February 7, 2024, a Functional Behavioral Assessment was completed. *See* Joint Exhibit 71.

13. On May 9, 2024, an IEP meeting was held.

14. On May 9, 2024, Parent requested an Independent Educational Evaluation. *See* Joint Exhibit 87.

15. The Parent's IEE Request was granted.

16. The IEE was performed by Dr. Keith Radley.

17. Dr. Radley provided a report dated May 26, 2024. *See* Joint Exhibit 91.

18. An IEP Team meeting was held on May 29, 2024. *See* Joint Exhibit 93.

19. The IEP Team, with the participation of Dr. Radley, completed a revised FBA and BIP. *See* Joint Exhibit 92.

### **Findings of Facts**:

20. Angela Johnston is a UT- licensed teacher and BCBA.

21. Angela Johnston is a cluster lead over three (3) autism clusters at Rose Creek Elementary School.

22. A cluster is a self-contained classroom.

23. Clusters are divided by grade level.

24. Angela Johnston does not provide direct instruction to students but interacts with students who need behavioral support.

25. Angela Johnston collects behavioral data and is responsible for behavior intervention plans (BIP).

26. Angela Johnston was introduced to Student and Parent in September 2024.

27. On September 03, 2024, Angela Johnson held an intake meeting with Parent at Rose Creek Elementary School.

28. Student arrived at Rose Creek with a BIP.

29. There is no seclusionary time-out unit in the autism unit at Rose Creek.

30. Student has not been placed in restraint(s) in the autism unit at Rose Creek.

31. The "chunking" intervention is used to reduce the amount of work given to a student to make the assignments manageable when students feel overwhelmed.

32. P.H. has made progress with the chunking intervention.

33. Teacher support specialists support teachers through brainstorming, teaching strategies, and providing interventions.

34. Teacher specialists attend IEP meetings, when invited.

35. Carollee Tautkus reports to Kim Lloyd.

36. Kim Lloyd is the Special Education Director.

37. Carollee Tautkus met Student in 2021 during a classroom visit at Golden Fields Elementary. (Hearing Day 3, page 27, Lines 6-12)

38. The IEP Team at Golden Fields met to consider the recommendations made by the LRE Committee that determined Student's placement should be Herriman ES. (JE-55-1).

39. Carollee Tautkus stated there was not a LRE Committee. (Hearing Day 3, Page 31, Line 22).

40. Tautkus did not know why JSD documents and teacher mention/reference an LRE Committee.

41. A SEB classroom (unit) is a social-emotional behavior support classroom.

42. Brian King is Carollee Tautkus' direct supervisor.

43. Brian King is the Assistant Director of Special Education.

44. Carollee Tautkus has access to student IEPs.

45. Carollee Tautkus denied that JSD had a LRE process.

46. JBAT is the Jordan Behavior Assistance Team.

47. JSD has resources available at the district level, called "district resources."

48. JSD has resources available at the school level, called "school resources."

49. The LRE Committee informs the teachers what resources are available to them. (Hearing Day 3, Page 85, Lines 19-20).

50. The LRE Committee meets on Wednesdays. (Hearing Day 3, Page 86, Lines 2-3).

51. Student's teacher believed that the district decided that placement at Kauri Sue was not a good option for him. (Hearing Day 3, Page 94, Lines 12-24).

52. Kathleen Garibaldi is a school psychologist.

53. Ben Washburn is a behavior specialist who works with JBAT.

54. Victoria Gustafon is a teacher specialist who worked with P.H. at Herriman ES.

55. Special classrooms are district resources. (Hearing Day 4, Page 136, Lines 15-16).

56. Brian King is not a core member of the IEP as he lacks special knowledge about individual students. (Hearing Day 4, Page 144, Lines 18-21).

57. Brian King has knowledge of a JSD LRE Committee that is no longer in effect. (Hearing Day 4, Page 146, Lines 14-19).

58. JSD follows the LRE process currently outlined in the technical assistance manual. (Hearing Day 4, Page 162, Lines 10-13).

59. All schools in the JSD district do not have self-contained classrooms.

60. A school resources is something that is inherently available within the school. (Hearing Day 4, Page 152, Lines 15-16).

61. A district resource is support that is available via collaboration with a teacher specialist. (Hearing Day 4, Page 153, Line 2-7).

62. There are a limited number of self-contained classrooms in the district. (Hearing Day 4, Page 152, Lines 4-5).

63. Student's Kindergarten teacher was Cassidy Wood.

64. In an email dated, February 21, 2023, the special education teacher and school psychologist express concerns about P.H. being placed in an SEB unit.

65. P.H.'s special education teacher believed that he would benefit from placement at Kauri Sue or an Autism unit.

66. P.H.'s special education teacher did not believe that he would do well in an SEB unit.

67. In a communication between the school psychologist and the parent, the psychologist noted "I don't know what the district will suggest but that [Kauri Sue] would be a good option."

68. On May 3, 2023, the teacher specialist directed the special education teacher to have a conversation with the Parent regarding considering a SEB support classroom for Student. The teacher was directed to let the specialist know the outcome of the conversation with the Parent. The teacher specialist stated that [we] can then look at moving forward with a meeting. (JE-38-1).

69. In an email dated May 08, 2023, it is revealed that the Parent is "upset and worried" after having a conversation with the teacher specialist who recommended a SEB unit. (JE-40-1).

70. In an email dated May 08, 2023, the special education teacher and school psychologist reference the "LRE team" and note that they "will not move him before next year, the idea is he will start the new year at the other school."

71. On October 20, 2023, the JSD LRE Review Office sent a letter providing notice to the principal at Golden Fields Elementary that P.H.'s placement is Herriman Elementary School- SEB unit.

72. In an email communication between the special education teacher and parent, the teacher informed parent that "they will only offer SEB." (JE-99-69)

73. The parent was offered placement in SEB units at Herriman Elementary and Elk Meadows Elementary.

74. The parent refused placement in an SEB unit at Elk Meadows.

75. In a communication between the parent and special education teacher, the teacher informed the parent that after meeting with the district "it sounds like the district is open to whatever you [parent] would want so that's positive." (JE-99-71)

76. Student's IEP dated 02/07/2024 included the following special education services:

    Math − 325 Minutes
    Reading − 375 Minutes
    Writing − 100 Minutes
    Behavior − 981 Minutes
    (JE-72-17)

77. Student's IEP dated 02/07/2024 fails to explain how the services correlate to his goals.

78. Student's IEP dated 02/07/2024 fails to explain how the services will be implemented; the IEP lacks identified program modalities to be used by teachers and/or other providers.

### Applicable Standards and Analysis

Two purposes of the IDEA (20 U.S.C. §§ 1400-1482) are (1) to ensure that students with disabilities have available to them a FAPE that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living; and (2) to ensure that the rights of students with disabilities and parents of such students are protected (20 U.S.C. §1400[d][1][A]-[B]; see generally Forest Grove Sch. Dist. V. T.A., 557 U.S. 230, 239 [2009]; Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. V. Rowley, 458 U.S. 176, 206-07 [1982]).

A FAPE is offered to a student when (a) the board of education complies with the procedural requirements set forth in the IDEA, and (b) the IEP is developed by its IEP team through the IDEA's procedures is reasonably calculated to enable the student to receive educational benefits (Rowley, 458 U.S. at 206-7). However, the "IDEA does not itself articulate any specific level of educational benefits that must be provided through and IEP" (Rowley, 458 U.S. at 189). "The adequacy of a given IEP turns on the unique circumstances of the child for whom it was created" (Endrew F. v. Douglas Cty. Sch. Dist. RE-1, 580 U.S. 386, 404). The statute ensures an "appropriate" education, "not one that provides everything that might be thought desirable by loving parents" (Walczak, 142 F.3d at 132, quoting Tucker v. Bay Shore Union Free Sch. Dist., 873 F.2d 563, 567 [2d Cir. 1989] [citations omitted]. Additionally, school districts are not required to "maximize" the potential of students with disabilities (Rowley, 458 U.S. 189, 199).

An appropriate educational program begins with an IEP that includes a statement of the student's present level of academic achievement and functional performance (see 34 CFR 300.320[a][1], establishes annual goals designed to meet the student's needs resulting from the student's disability and enable him or her to make progress in the general education curriculum (see 34 CFR 300.320[a][2][i], [2][i][A], and provides for the use of appropriate special education

325   services (see 34 CFR 300.320[a][4]). In developing the recommendations for a student's IEP, the

326   IEP team must consider the results of the initial or most recent evaluation the student's strengths,

327   the concerns of the parents for enhancing the education of their child; the academic,

328   developmental, and functional needs of the student, including, as appropriate, the student's

329   performance on any general State or district-wide assessments as well as any special factors as set

330   forth in federal and State regulations ( see 34 CFR 300.324[a]).

331          Federal circuit courts have provided guidance on how to determine whether

332   implementation has occurred and the degree to which any flawed implementation constitutes a

333   denial of FAPE. In essence, the IDEA's implementation mandate does not mean that, to provide

334   FAPE, a district must perfectly implement a student's IEP. A minor discrepancy between the

335   services provided and services required under the IEP is not enough to amount to a denial of FAPE.

336   See I.Z.M. v. Rosemunt-Apple Valley-Eagan Pub. Schs., 70 IDELR 86 (8th Cir. 2017). An IEP is

337   not required to "furnish[] … every special service necessary to maximize each handicapped child's

338   potential." Grim v. Rhinebeck Cent. Sch. Dist., 346 F.3d 377, 379 (2d Cir. 2003) (citation and

339   internal quotation marks omitted).

340          The Fourth, Fifth, Eighth, Ninth, and Eleventh Circuit Courts of Appeal have held that

341   only a material implementation failure will qualify as a denial of FAPE. See Sumter County Sch.

342   Dist. 17 v. Hefferman, 56 IDELR 186 (4th Cir. 2011); Houston Indep. Sch. Dist. v. Bobby R., 31

343   IDELR 185 (5th Cir. 2000), cert denied, 111 LRP 30885, 531 U.S. 817 (2000); Neosho R-V Sch.

344   Dist. v. Clark, 38 IDELR 61 (8th Cir. 2003); Van Suyn v. Baker Sch. Dist. 5J, 47 IDELR 182 (9th

345   Cir. 2007), reprinted as amended, 107 LRP 51958, 502 F.3d 811 (9th Cir. 2007); and L.J. v. School

346   Bd. of Broward County, Fla., 74 IDELR 185 (11th Cir. 2019).

347

348

**<u>Least Restrictive Environment</u>**

349

350    The IDEA requires that a student's recommended program be provided in the Least

351    Restrictive Environment (LRE) (20 U.S.C. § 1412[a][5][A]; 34 CFR 300.107, 300.114[a][2][i],

352    300.116[a][2], 300.117; see <u>T.M.</u>, 752 F.3d at 161-67; <u>Newington</u>, 546 F.3d at 111; <u>Gagliardo</u>,

353    489 F.3d at 105; <u>Walczak</u>, 142 F.3d at 132; <u>Patskin v. Bd. of Educ. of Webster Cent. Sch. Dist.</u>,

354    583 F. Supp. 2d 422, 428 [W.D.N.Y. 2008]).

355    In determining an appropriate placement in the LRE, the IDEA requires that students with

356    disabilities be educated to the maximum extent appropriate with students who are not disabled

357    and that special classes, separate schooling, or other removal of students with disabilities from the

358    general educational environment may occur only when the nature or severity of the disability is

359    such that education in regular classes with the use of supplementary aids and services cannot be

360    achieved satisfactorily (20 U.S.C. § 1412[a][5][A]; see 34 CFR 300.114[a][2][i], 300.116[a][2];

361    <u>Newington</u>, 546 F.3d at 112, 120- 21; <u>Oberti v. Bd. of Educ. of Borough of Clementon Sch. Dist.</u>,

362    995 F.2d 1204, 1215 [3d Cir. 1993]; <u>J.S. v. N. Colonie Cent. Sch. Dist.</u>, 586 F. Supp. 2d 74;

363    <u>Patskin</u>, 583 F. Supp. 2d at 430; <u>Watson v. Kingston City Sch. Dist.</u>, 325 F. Supp. 2d 141, 144

364    [N.D.N.Y. 2004]; <u>Mavis v. Sobol</u>, 839 F. Supp. 968, 982 [N.D.N.Y. 1993]). The placement of an

365    individual student in the LRE shall "(1) provide the special education needed by the student; (2)

366    provide for education of the student to the maximum extent appropriate to the needs of the student

367    with other students who do not have disabilities; and (3) be as close as possible to the student's

368    home" (see 34 CFR 300.116). Consideration is also given to any potential harmful effect on

369    students or on the quality of services that they need (34 CFR 300.116[d]).

370    In the present case, the Petitioner alleges that JSD denied P.H. FAPE by predetermining

371    his LRE environment.

372          Predetermination occurs when an educational agency has made its determination prior to

373    the IEP meeting, including when it presents one placement option at the meeting and is unwilling

374    to consider other alternatives." <u>H.B. v. Las Virgenes USD</u>, 239 Fed. Appx. 342 (9th Cir. 2007).

375    Predetermination of a student's IEP amounts to a procedural violation of the IDEA "if it deprives

376    the student's parents of meaningful participation in the IEP process." <u>B.K. v. New York City Dep't</u>

377    <u>of Educ.</u>, 12 F. Supp. 3d 343 358 (E.D.N.Y. 2014). For an IEP to be predetermined, the district

378    must "not have an open mind" to consider alternative programs or services during the meeting.

379    <u>T.P. v. Mamaroneck Union Free Sch. Dist.</u>, 554 F.3d 253 (2d Cir. 2009). Mere parental

380    disagreement with a school district's IEP and placement recommendation does not amount to a

381    denial of meaningful participation. See <u>B.K.</u>, 12 F. Supp. 3d at 359 ("The mere fact that the CSE's

382    [IEP team's] ultimate recommendation deviated from the express request [of the Parents] does not

383    render the Parents 'passive observers' or evidence any predetermination on the part of the CSE

384    [IEP team])." (citations omitted)); <u>P.K. v. Bedford Cent. Sch. Dist.</u>, 569 F. Supp. 2d 371, 383

385    (S.D.N.Y. 2008) ("The mere fact that the district staff ultimately disagreed with the opinions of

386    plaintiffs and their outside professionals does not mean that plaintiffs were denied the opportunity

387    to participate in the development of the IEP's, or that the outcomes of the CSE [IEP team]

388    meetings were 'pre-determined.' A professional disagreement is not an IDEA violation."); <u>Sch. For</u>

389    <u>Language & Commc'n Dev. v. New York State Dep't of Educ.</u>, No. 02 CV 0269 JS JO, 2006 WL

390    2792754, at *7 (E.D.N.Y. Sept. 26, 2006) ("Meaningful participation does not require deferral to

391    parent choice." (citations omitted)).

392          Predetermination is not synonymous with preparation." <u>Nack ex rel. Nack v. Orange City</u>

393    <u>Sch. Dist.</u>, 454 F. 3d 604, 610 (6th Cir. 2006). "IDEA regulations allow school districts to engage

394    in 'preparatory activities … to develop a proposal or response to a parent proposal that will be

395    discussed at a later meeting' without affording the parents an opportunity to participate." <u>T.P.</u>,

554 F.3d at 253 (citations omitted). School districts are permitted to come prepared to the CSE [IEP team] meeting with a draft IEP – as long as it has not been finalized, and the parents are not deprived of "the opportunity to meaningfully participate in the IEP development process." M.M. ex rel. A.M. v. New York City Dep't of Educ., Region 9 (Dist. 2), 583 F. Supp. 2d 498, 506 (S.D.N.Y. 2008) (citations omitted); see also Dirocco ex. Rel. M.D. v. Bd. of Educ. of Beacon City Sch. Dist., No. 11 CIV 3897 ER, 2013 WL 25959, at *18 (S.D.N.Y. Jan. 2, 2013); Nack, 454 F.3d at 611 ("[S]chool evaluators may prepare reports and come with pre-formed opinions regarding the best course of action for the child as long as they are willing to listen to the parents and parents have the opportunity to make objections and suggestions." (citation and internal quotation marks omitted)); W.S. ex rel. C.S. v. Rye City Sch. Dist., 454 F. Supp. 2d 134, 147-48 (S.D.N.Y. 2006) (Equating draft IEPs containing proposed placements with predetermination "will inevitably lead to gamesmanship in the preparation of IEPs by CSEs [IEP teams], with the district withholding points of view that ought to be out on the table and subject to discussion and parental challenge (which may or may not be successful) prior to the document's finalization.")

The IDEA contains a subsection titled "Least Restrictive Environment (LRE)." The subsection provides: "To the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are [to be] educated with children who are not disabled …" 20 U.S.C. § 1412(a)(5). States that receive federal special education funding must ensure that:

[S]pecial classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

The text of the subsection, providing that taking the child out of the mainstream only when satisfactory education cannot be achieved with supplementary aids and services, creates an

422    affirmative obligation to provide the supplementary aids and services to forestall the possibility of

423    moving the child to a separate setting outside of regular classes. It also supports the observation

424    that special education is a bundle of services and accommodations to enable a child who has

425    disabilities to learn, rather than a place to put a child. The provisions of IDEA covering IEPs

426    reinforce that message. An IEP must include:

427    (IV) a statement of the special education and related services and supplementary aids and
428    services, based on peer-reviewed research to the extent practicable, to be provided to the
429    child, or on behalf of the child, and a statement of the program modifications or supports
430    for school personnel that will be provided for the child –

432    (aa) to advance appropriately toward attaining the annual goals; and

434    (bb) to be involved in and make progress in the general education curriculum in accordance
435    with subclause (I) and to participate in extracurricular and other nonacademic activities;
436    and

438    (cc) to be educated and participate with other children with disabilities and nondisabled
439    children in the activities described in this subparagraph; and

441    (V) an explanation of the extent, if any, to which the child will not participate with
442    nondisabled children in the regular class and in the activities described in subclause (IV)(cc).

444    20 U.S.C. § 1414(d).

446    Here, the Petitioner argues that JSD reached outside the scope of permissible

447    administrative oversight of special education programs by developing and implementing a LRE

448    Review Process, which is documented in its explanatory LRE Process Manual. Per the LRE

449    Process Manual, JSD maintained "school resources" and "district resources." Per the manual,

450    district resources were noted as "not inherently available to IEP teams at the school level and may

451    be considered only by collaborating with a special education teacher specialist." It is noted that

452    self-contained classrooms and special schools were listed as district resources. The manual further

453    notes that any service or placement designated as a "district resource" can only be considered after

454    "exhausting all school resources and available district supports."  Based on the foregoing, the

455    Petitioner asserts that the IEP team for P.H. could not make changes to his LRE environment

456    without prior approval from the District's LRE Review Process.

457        To further support their argument, the Petitioner proffered <u>P.L. and M.L. v. New York</u>

458    <u>City Dep't of Educ.</u>, wherein the Eastern District of New York found the local educational agency

459    denied [a student] FAPE because the student's unique needs were not considered when it offered

460    it's "standard proposal" for students on the autism spectrum. <u>P.L. and M.L. v. New York City</u>

461    <u>Dep't of Educ.</u>, 56 F. Supp. 3d 147, 165 (E.D.N.Y. 2014). The Petitioner posits that the student in

462    the present case is similarly situated like "M.L." Petitioner avers that P.H., like "M.L.", was offered

463    no specific reason(s) for his placement in his LRE; that JSD only provided vague reasons (i.e., "an

464    SEB could handle the [Student's] BIP"; "[an SEB could] provide the support that he requires) for

465    P.H.'s LRE placement.

466        More concerning is the Petitioner's allegation that P.H.'s assignment in the SEB unit

467    essentially the result of the District's limited placement resources; the SEB unit was the only class

468    available to accommodate P.H. at the time of placement.

469        Next, the Petitioner turned its attention to communications between the IEP team

470    members regarding P.H.'s LRE environment. Petitioner specifically points to an email dated

471    February 21, 2023, between the special education teacher and school psychologist wherein the

472    teacher expresses concern about P.H. being placed in an SEB unit. The teacher believes P.H.

473    would benefit from placement at Kauri Sue Hamilton School or an Autism unit. The school

474    psychologist also notes that she believed Kauri Sue to be a good placement option, but "did not

475    know what the district would suggest." Finally, the Petitioner asserts that P.H.'s placement in an

476    SEB was not reasonably calculated according to his individual needs because there was no data to

477    support the decision. Petitioner offered parental observations of P.H.'s behaviors in the home

478    environment, Functional Behavioral Assessment (FBA) data, and data from a psychoeducational

479  evaluation conducted in April 2023 to support its argument that the decision to place P.H. in an

480  SEB unit was unfounded; furthermore, there was no support for the placement at the IEP team

481  level.

482      Conversely, the District argues that it maintains a full continuum of placements and

483  specifically considered said continuum with respect to P.H. The District denies that P.H.'s LRE

484  was predetermined at the administrative level and maintains that it was appropriately determined

485  by the IEP team. The District avers that P.H.'s appropriate placement is a self-contained classroom

486  within a general education school.

487      To support its LRE decision, the District cites Ellenberg v, New Mexico Mil. Inst., 478

488  F.3d 1262, 1277 (10th Cir. 2007) (citing L.B. ex. Rel. K.B. v. Nebo School District, 379 F. 3d 966

489  (10th Cir. 2004) wherein the court developed a test for determining  whether an educational

490  placement is a student's LRE; [courts] look to (1) 'whether education in a regular classroom, with

491  the use of supplemental aids and services, can be achieved satisfactorily;' and (2) 'if not, if the school

492  district has mainstreamed the child to the maximum extent appropriate.'

493  A closer examination of Nebo is relevant here:

494      In Nebo, the Court adopted the two-part test previously stated in Daniel R.R. v. Bd. Of

495  Education, 874 F.2d 1036 (5th Cir. 1989): (1) determines: whether education in a regular classroom,

496  with the use of supplementary aids and services can be achieved satisfactorily; and (2) if not, the

497  court determines if the school district has mainstreamed the child to the maximum extent

498  appropriate. Next, the Court outlined four factors to be considered in determining the first part of

499  the test:

500  (1) Steps the school district has taken to accommodate the child in a regular classroom,
501      including the consideration of a continuum of placement and support services;
502

503  (2) Comparison of the academic benefits the child will receive in the regular classroom with
504      those [s]he will receive in the special education classroom;

(3) The child's overall educational experience in regular education, including non-academic benefits; and

(4) The effect on the regular classroom of the disabled child's presence in that classroom.

On the contrary, the District contends that it has satisfied the <u>Nebo</u> test. As evidence, the District points to its review of P.H.'s IEPs and placement history; its review of data from P.H.'s psychoeducational assessment and other test results; P.H.'s IQ; and several IEP team meetings held to discuss P.H.'s LRE placement. While the District does not dispute that IEP team members were considering Kauri Sue Hamilton, a special school, as an appropriate placement for P.H., it contends that it was the IEP team's review of student data and subsequent IEP team discussions that ultimately led to a finding that the school was not an appropriate placement.

## **Parental Participation**

The IDEA sets forth procedural safeguards that include providing parents an opportunity "to participate in meetings with respect to the identification, evaluation, and educational placement of the child" (20 U.S.C. § 1415[b][1]). Federal and State regulations governing parental participation require that LEAs take steps to ensure that parents are present at their child's IEP meetings or are afforded the opportunity to participate (34 CFR 300.322; SpEd Rules III.G.).

Although school district's must provide an opportunity for parents to participate in the development of their child's IEP, mere parental disagreement with a school district's proposed IEP or placement recommendation does not amount to a denial of meaningful participation (see <u>T.F. v. New York City Dep't of Educ.</u>, 2015 WL 5610769, at *5 [S.D.N.Y. Sept. 23, 2015]; A.P., 2015 WL 4597545 at *8, *10; <u>E.F. v. New York City Dep't of Educ.</u>, 2013 WL 4495676 at *17 [E.D.N.Y Aug 19, 2013][stating that "as long as the parents are listened to, "the right to participate in the

development of the IEP is not impeded, "even if the [district] ultimately decides not to follow the parents' suggestions"]; P.K. v. Bedford Cent. Sch. Dist., 569 F. Supp. 2d 371, 383 [S.D.N.Y. 2008][noting that "[a] professional disagreement is not an IDEA violation"]; Sch. For Language & Commc'n Dev v. New York State Dep't of Educ., 2006 WL 2792754, at *7 [E.D.N.Y. Sept. 26, 2006][finding that "[m]eaningful participation does not require deferral to parent choice"]).

When determining whether a school district has complied with the IDEA's procedural requirements, the inquiry focuses on whether the parents "had an adequate opportunity to participate in the development" of their child's IEP (Cerra, 427 F.3d at 192). Moreover, "the IDEA only requires that the parents have an opportunity to participate in the drafting process" (D.D-S. v. Southold Union Free Sch. Dist., 2011 WL 3919040, at *11 [E.D.N.Y. Sept 2, 2011], quoting A.E. v. Westport Bd. of Educ., 463 F. Supp. 2d 208, 216 [D. Conn. 2006]; see T.Y. v. New York City Dept' of Educ., 584 F.3d 412, 420 [2d Cir. 2009][noting that the IDEA gives parents the right to participate in the development of their child's IEP, not a veto power over those aspects of the IEP with which they do not agree]).

In the present case, the Petitioner alleges that they were denied an opportunity to meaningfully participate in the development of P.H.'s IEP. To support its argument, the Petitioner asserts that the District held formal, regularly scheduled "LRE Committee" meetings between teacher specialists and the district administrators to discuss concerns regarding P.H.'s IEP and placement decisions. The Petitioner contends that these placements meetings extended beyond the scope of the IDEA's regulations at 34 CFR § 300.501(1)(3), which provides that a "meeting" for the purposes of the parent participation requirement does not include "informal or unscheduled conversations" or "preparatory activities […] to develop a proposal or response to a parent proposal that will be discussed at a later meeting."

554  The Petitioner contends that the District's LRE Committee met on a scheduled and
555  consistent basis to discuss and predetermine student placements in anticipation of IEP team
556  meetings. And, that IEP teams meetings were merely performative to satisfy the parental
557  participation requirement. As evidence, the Petitioner cites communications between IEP team
558  members wherein, they discuss concerns about P.H.'s placement in a SEB unit. (JE-25-1). The
559  Petitioner next points to an email dated May 03, 2023, where the teacher specialist is directing the
560  special education teacher to have a conversation with the parent about considering a SEB support
561  classroom. The teacher is then directed to "let me [the district] know how it went. We can then
562  look at moving forward with a meeting." (JE-38-1). The Petitioner also cites an email dated May
563  08, 2023, where it is revealed that the Parent is "upset and worried" after having a conversation
564  with the teacher specialist who recommended a SEB unit. (JE-40-1).

565

566  **IEP Reasonably Calculated to Allow Student to Make Progress**

567  An appropriate educational program begins with an IEP that includes a statement of the
568  student's present level of academic achievement and functional performance (see 34 CFR
569  300.320[a][1], establishes annual goals designed to meet the student's needs resulting from the
570  student's disability and enable him or her to make progress in the general education curriculum
571  (see 34 CFR 300.320[a][2][i], [2][i][A], and provides for the use of appropriate special education
572  services (see 34 CFR 300.320[a][4]). In developing the recommendations for a student's IEP, the
573  IEP team must consider the results of the initial or most recent evaluation the student's strengths,
574  the concerns of the parents for enhancing the education of their child; the academic,
575  developmental, and functional needs of the student, including, as appropriate, the student's
576  performance on any general State or district-wide assessments as well as any special factors as set
577  forth in federal and State regulations ( see 34 CFR 300.324[a]).

578    Federal circuit courts have provided guidance on how to determine whether

579    implementation has occurred and the degree to which any flawed implementation constitutes a

580    denial of FAPE. In essence, the IDEA's implementation mandate does not mean that, to provide

581    FAPE, a district must perfectly implement a student's IEP. A minor discrepancy between the

582    services provided and services required under the IEP is not enough to amount to a denial of FAPE.

583    See I.Z.M. v. Rosemunt-Apple Valley-Eagan Pub. Schs., 70 IDELR 86 (8th Cir. 2017). The

584    Fourth, Fifth, Eighth, Ninth, and Eleventh Circuit Courts of Appeal have held that only a material

585    implementation failure will qualify as a denial of FAPE. See Sumter County Sch. Dist. 17 v.

586    Hefferman, 56 IDELR 186 (4th Cir. 2011); Houston Indep. Sch. Dist. v. Bobby R., 31 IDELR 185

587    (5th Cir. 2000), cert denied, 111 LRP 30885, 531 U.S. 817 (2000); Neosho R-V Sch. Dist. v. Clark,

588    38 IDELR 61 (8th Cir. 2003); Van Suyn v. Baker Sch. Dist. 5J, 47 IDELR 182 (9th Cir. 2007),

589    reprinted as amended, 107 LRP 51958, 502 F.3d 811 (9th Cir. 2007); and L.J. v. School Bd. of

590    Broward County, Fla., 74 IDELR 185 (11th Cir. 2019).).

591    The IDEA directs that, in general, an IHO's decision must be made on substantive grounds

592    based on a determination of whether the student received a FAPE (20 U.S.C. § 1415[f][3][E][i]).

593    A school district offers a FAPE "by providing personalized instruction with sufficient support

594    services to permit the child to benefit educationally from that instruction" (Rowley, 458 U.S. at

595    203). However, the "IDEA does not itself articulate any specific level of educational benefits that

596    must be provided through an IEP" (Walczak, 142 F. 3d at 130; see Rowley, 458 U.S. at 189). "The

597    adequacy of a given IEP turns on the unique circumstances of the child for whom it was created"

598    (Endrew F., 580 U.S. at 404). The statute ensures an "appropriate" education, "not one that

599    provides everything that might be thought desirable by loving parents" (Walczak, 142 F.3d at 132,

600    quoting Tucker v. Bay Shore Union Free Sch. Dist., 873 F.2d 563, 567 [2d Cir. 1989] [citations

601    omitted]; see Grim, 346 F.3d at 379). Additionally, school districts are not required to "maximize"

602  the potential of students with disabilities (Rowley, 458 U.S. at 189, 199; Grim, 346 F.3d at 379;

603  Walczak, 142 F.3d at 132). Nonetheless, a school district must provide "an IEP that is 'likely to

604  produce progress, not regression,' and . . . affords the student with an opportunity greater than

605  mere 'trivial advancement'" (Cerra, 427 F.3d at 195, quoting Walczak, 142 F.3d at 130 [citations

606  omitted]; see T.P., 554 F.3d at 254; P. v. Newington Bd. of Educ., 546 F.3d 111, 118-19 [2d Cir.

607  2008]). The IEP must be "reasonably calculated to provide some 'meaningful' benefit" (Mrs. B. v.

608  Milford Bd. of Educ., 103 F.3d 1114, 1120 [2d Cir. 1997]; see Endrew F., 580 U.S. at 403 [holding

609  that the IDEA "requires an educational program reasonably calculated to enable a child to make

610  progress appropriate in light of the child's circumstances"]; Rowley, 458 U.S. at 192). The Court

611  in Endrew held that  the "adequacy of a given IEP turns on the unique circumstances of the child

612  for whom it was created" and the "nature of the IEP process [] ensures that parents and school

613  representatives will fully air their respective opinions on the degree of progress a child's IEP should

614  pursue; thus, by the time any dispute reaches court, school authorities will have had the chance to

615  bring their expertise and judgment to bear on areas of disagreement" (Endrew F. , 580 U.S. at p.

616  404). Lastly, the Supreme Court held that the "reviewing court may fairly expect those authorities

617  to be able to offer a cogent and responsive explanation for their decisions that shows the IEP is

618  reasonably calculated to enable the child to make progress appropriate in light of his

619  circumstances." (id).

620       Here, the Petitioner contends that P.H.'s IEP was not reasonably calculated to allow him

621  to make progress because it was developed at the administrative level and not by the IEP team. As

622  such, the IEP focused less on student's needs and more on resource availability. The Petitioner also

623  suggests that P.H.'s IEP at Herriman Elementary (start date 01/31/2024) was further complicated

624  by the way it was written. P.H.'s services were to be provided in total weekly minutes (i.e., 981

625  minutes of behavior) with no explanation how they would be administered and measured.

626        The District argued that the Petitioner used a hindsight approach to challenge the

627 appropriateness of P.H.'s IEPs. However, it failed to introduce sufficient evidence to support a

628 finding that P.H.'s most recent IEP is appropriate.

629

630 ## **Compensatory Education**

631        Compensatory education is an equitable remedy that is tailored to meet the unique

632 circumstances of each case (Wenger v. Canastota, 979 F. Supp. 147 [N.D.N.Y. 1997]). The

633 purpose of an award of compensatory education is to provide an appropriate remedy for a denial

634 of a FAPE (see E.M., 758 F.3d at 451; P. v. Newington Bd. of Educ., 546 F.3d 111, 123 [2d Cir.

635 2008] [holding that compensatory education is a remedy designed to "make up for" a denial of a

636 FAPE]; see also Doe v. E. Lyme Bd. of Educ., 790 F.3d 440, 456 [2d Cir. 2015]; Reid v. Dist. of

637 Columbia, 401 F.3d 516, 524 [D.C. Cir. 2005] [holding that, in fashioning an appropriate

638 compensatory education remedy, "the inquiry must be fact-specific, and to accomplish IDEA's

639 purposes, the ultimate award must be reasonably calculated to provide the educational benefits

640 that likely would have accrued from special education services the school district should have

641 supplied in the first place"]; Parents of Student W. v. Puyallup Sch. Dist., 31 F.3d 1489, 1497 [9th

642 Cir.1994]). Accordingly, an award of compensatory education should aim to place the student in

643 the position he or she would have been in had the district complied with its obligations under the

644 IDEA (see Newington, 546 F.3d at 123 [holding that compensatory education awards should be

645 designed so as to "appropriately address[] the problems with the IEP"]; see also Draper v. Atlanta

646 Indep. Sch. Sys., 518 F.3d 1275, 1289 [11th Cir. 2008] [holding that "[c]ompensatory awards

647 should place children in the position they would have been in but for the violation of the Act"];

648 Bd. of Educ. of Fayette County v. L.M., 478 F.3d 307, 316 [6th Cir. 2007] [holding that "a flexible

649 approach, rather than a rote hour-by-hour compensation award, is more likely to address [the

650    student's] educational problems successfully"]; <u>Reid</u>, 401 F.3d at 518 [holding that compensatory

651    education is a "replacement of educational services the child should have received in the first place"

652    and that compensatory education awards "should aim to place disabled children in the same

653    position they would have occupied but for the school district's violations of IDEA"]).

654

655                                    **<u>Conclusions of Law</u>**

656        In consideration of the foregoing facts and arguments, the undersigned finds:

657    1.    That the Petitioner has satisfied its burden to prove that during the relevant time-period

658          the Jordan School District developed and maintained a LRE Process that predetermined

659          P.H.'s educational placement and special education services.

660    2.    That P.H.'s IEP was not reasonably calculated to allow him to make progress.

661    3.    That predetermination precluded Petitioner's parent active participation in his educational

662          program.

663                                         **<u>ORDER</u>**

664    The undersigned finds in favor of the Petitioner and Student, and against the Respondent

665    (Jordan School District), and hereby grants the Petitioner the following relief:

666    1.    Petitioner is the prevailing party.

667    2.    JSD is ordered to fund an independent thorough and appropriate evaluations for the
668          purposes of identifying current baselines across P.H.'s educational performance areas of
669          Academics, Communication, and Social/Emotional Development. This shall include, but
670          not limited to: Cognitive, Achievement, Behavior, Adaptive Functioning,
671          Speech/Language (to include pragmatics), Occupational Therapy (to include
672          sensory/attention observation in instructional settings). JSD will reimburse the parent for
673          the transportation costs associated with the IEE at the mileage rate typically reimbursed to
674          JSD employees.
675
676    3.    JSD shall utilize mutually agreed-upon third party reading specialist to assess P.H. for skill
677          deficits in reading comprehension, fluency, written expression and other skills necessary for
678          academic reading.

4. JSD shall utilize the services of a mutually agreed-upon third party psychometrist to assess P.H. in the area of math including, but not limited to, math computation and other mathematical concepts.

5. Within twenty-one (21) days of receiving the afore-mentioned evaluation results/reports, JSD shall convene a facilitated IEP team meeting.

6. JSD shall invite the psychometrist, math coach, and reading specialist to the IEP team meeting to perform the following tasks:
   a. Explain the results of the assessments conducted to the IEP team and the reasonable recommendations, including the reading/math program that would be appropriate for P.H.
   b. Notate, within the IEP, the appropriate frequency level of services as recommended by the adopted reading/math program, define the data collection that will be taken to monitor progress, and provide verification to the Parent that the teacher and any other staff members who will be providing instruction to P.H. in these areas, meets the competency requirements, as specified in the adopted reading/math program, for instructing students in the given program.
   c. Train applicable staff on the proper methods of data collection to monitor Student's progress with the reading/math program.
   d. Participate as a team member of P.H.'s IEP team through at least the end of the 1st semester of the 2025-2026 school year.
   e. Provide recommendations for program modifications as needed.

7. JSD shall provide P.H. with one hundred (100) hours compensatory, remedial educational services in behavior, speech, math and reading based upon his deficits and areas of need identified in the evaluations and assessments previously referenced in this Order as well as progress and data collections throughout the 2024-2025 school year. The compensatory services shall be delivered during the 2025 summer through the first semester of the 2025-2026 school year.
   (i) The location and schedule for the services will be determined by the IEP Team prior to the beginning of the services, based on the availability and schedules of the service provider(s) and, to the extent reasonable, the Parent.
   (ii) The remedial services pursuant to this Paragraph will be offered regardless of whether the IEP Team determines Student qualifies for Extended School Year ("ESY") services. If Student qualifies for ESY services during the summer of 2025, any remedial services offered and available during that time-period are in addition to ESY hours.
   (iii) If Student is unable to attend a remedial service session pursuant to this Paragraph, the Parent will provide notice to JSD at least twenty-four (24) hours in advance of the scheduled session. If Student fails to attend two (2) remedial service sessions without the provision of notice, JSD's obligation to provide any further remedial services pursuant to this Paragraph will cease. "Notice" for the purposes of this subparagraph means contacting a JSD representative either by phone/voicemail or email at least 24 hours in advance. JSD will designate in writing the representative (including contact information) to whom the Parent should provide notice.

8. JSD shall provide P.H. a mutually agreeable Board Certified Behavior Analyst ("BCBA"), who will collect all collateral information, including without limitation, interviews with relevant School District staff working with P.H., the Parent and any private counselors and therapists; review, as requested by the BCBA, pertinent education records and any private healthcare or service provider reports available to the School District and, thereafter, perform a Functional Behavior Assessment ("FBA"), and, if deemed appropriate by the BCBA, develop a Behavior Intervention Plan ("BIP") to address P.H.'s behaviors that impact his learning and educational performance. In addition, the BCBA will do the following:

   a) The BCBA will consider P.H. as the client pursuant to the Behavior Analyst Certification Board (BACB) ethical requirements.

   b) Make recommendations to the IEP team on whether developmental assessments (i.e., ABLLS) would be beneficial and, if adopted by the IEP team, conduct said assessment and explain results to the IEP team. Using the data from the FBA, and any other assessments completed, create a skill acquisition program individualized for P.H. with pertinent goals matched to Utah Standards.

   c) If a BIP is developed, the BCBA will develop a data collection system to be used by School District staff in assessing P.H.'s progress with the BIP in reducing target behaviors. Also, train applicable staff have been trained to a level of competency using a competency checklist established by the BCBA on the BIP and in any areas where the IEP team is incorporating goals, plans or programs. Incorporate periodic integrity checks and provide additional training if it becomes necessary.

   d) Make recommendations on whether changes need to be made to P.H.'s Least Restrictive Environment (LRE) based upon the evaluations and his abilities and needs. Work with School District Staff to accommodate P.H. into the General Education setting to the maximum extent appropriate.

   e) Make recommendations regarding the need for ABA Strategies to be provided for the Petitioner inside the school setting.

   f) Provide parent training on the strategies recommended and adopted by the IEP team.

   g) Make recommendations regarding the need for targeted trained Aide support to assist P.H. in skill acquisition and make academic gains inside the general education setting. This would include any recommendations applicable to P.H.'s preferred means of communication.

   h) Once the services pursuant to this Paragraph are completed, the IEP Team will consider the reasonable educational recommendations of the BCBA for on-going support to assist staff in the appropriate implementation of P.H.'s program.

i) Work with the District's SLP, if applicable, and teachers and staff to create a plan, to include competency-based training, to promote and encourage P.H.'s social skills and communication skills throughout the day.

j) The BCBA shall be invited to attend, as a participating member of the team, any IEP meetings convened until deemed not necessary based on P.H.' progress and behavior intervention plan data through the end of the first semester of the 2025-2026 school year.

**DONE AND ORDERED** this the 24th day of March 2025.

## <u>Notice of Right to Appeal</u>

This is the final administrative decision in this matter. Any party aggrieved by the findings and decision herein has the right to bring a civil action in the appropriate Court under 20 U.S.C. Section 1415. Pursuant to State Bd. of Educ., Special Education Rules IV. P., (2016), this decision may be appealed. If appealed, the appeal must be filed within thirty (30) days of the due process hearing decision. Sped. Rule IV.S. (2).

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of this Decision has been forwarded to the following individuals by electronic mail on this the 24th day of March 2025.

Maya Anderson, Esq.
Joan Andrews, Esq.
Katie Cox, Esq.
Sarah Vaughn, Esq.

*/s/ Nika Gholston*
Nika Gholston
Due Process Hearing Officer